UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

PHILIP J. STAUN,

*Plaintiff-Appellee,*

v.

RALLY'S, INCORPORATED,

*Defendant-Appellant.*

⎫
⎪
⎬
⎪
⎭

No. 00-1630

Appeal from the United States District Court
for the Middle District of North Carolina, at Greensboro.
N. Carlton Tilley, Jr., Chief District Judge.
(CA-93-333-2)

Argued: March 2, 2001

Decided: January 16, 2003

Before WIDENER and LUTTIG, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

Affirmed by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Donnell Roy Grubbs, SHAYNE & GREENWALD CO.,
L.P.A., Columbus, Ohio, for Appellant. Thomas Keith Black, FOR-
MAN, ROSSABI, BLACK, MARTH, IDDINGS & ALBRIGHT,
P.A., Greensboro, North Carolina, for Appellee. **ON BRIEF:** Gary D.
Greenwald, SHAYNE & GREENWALD CO., L.P.A., Columbus,
Ohio; Julianna C. Theall, Matthew W. Sawchak, SMITH, HELMS,
MULLISS & MOORE, L.L.P., Greensboro, North Carolina, for

Appellant. Paul Edward Marth, FORMAN, ROSSABI, BLACK, MARTH, IDDINGS & ALBRIGHT, P.A., Greensboro, North Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

Rally's, Inc. (Rally's) appeals the district court's denial of its motion for judgment as a matter of law, or in the alternative, for a new trial, Fed. R. Civ. P. 50. The district court denied Rally's motion following the jury's verdict in favor of Philip Staun (Staun) on his breach of contract claim against Rally's. We affirm.

I

From October 1990 until January 29, 1993, Staun was vice-president of manufacturing at Beaman Corporation (Beaman). Under his employment agreement with Beaman, Staun was entitled to numerous salary, fringe, and severance benefits. No severance was payable, however, if Staun was terminated for cause.

In December 1992, Beaman filed for bankruptcy after its London parent went into receivership. That same month, Rally's purchased all of Beaman's stock.

On January 22, 1993, Wayne Albritton (Albritton), the president of Rally's, met with Vincent Derr (Derr), Beaman's president, and asked for both his resignation and Staun's. In his initial conversation with Albritton, Derr was told that Rally's would honor both employees' employment agreements. Derr communicated this information to Staun. William Klausman (Klausman), Rally's attorney, later confirmed to Staun that Rally's would honor the employment agree-

ments. Both Derr and Staun wanted a written commitment from Rally's and, with that goal in mind, they did not tender their resignations, but continued to work the week of January 25, 1993. Derr and Staun hired attorneys to negotiate a final severance package from Rally's. Derr hired Jonathan Harkavy (Harkavy) and Staun hired Fred Hamlet (Hamlet).

The first negotiation on severance packages for Derr and Staun occurred on January 26, 1993 in a conference call between Hamlet, Harkavy, and Klausman. Harkavy and Hamlet requested several items for their clients in addition to severance pay. These items included accrued vacation, restoration of the employees' original salaries (since both had taken a voluntary pay cut), health insurance, and country club and car allowances, which had been part of the original employment agreements. Klausman informed them that he would look into these items and get back to them.

On January 29, 1993, Klausman called Harkavy and stated that he was submitting Rally's final, non-negotiable offer. Derr was to have a 10% restoration of his salary, but Staun was to be paid at his reduced rate. Derr was to be paid some of his accrued vacation, but Staun would not. Both employees would get health insurance for six months, but neither employee would get country club or car allowances. Harkavy further recorded in his notes that Rally's would prevent a "free fall." (J.A. 396). When questioned as to the meaning of that statement, Harkavy testified:

> That had specific reference to what, which was the heart of what I was asking for, which was the agreement from Rally's to be the underwriter on this. And he specifically said, this was Klausman specifically saying, Rally's would prevent a free fall—free fall from being that they (Derr and Staun) wouldn't get paid at all.

*Id.*

Harkavy and Derr then went to Hamlet's office where Harkavy first met with Hamlet privately and explained Klausman's offer. Harkavy told Hamlet that Staun would not receive any vacation benefits because of the allegation that Staun had been excessive in his air

travel. The attorneys then met with both clients and communicated Rally's offer to them, including the provision that Staun would not be receiving accrued vacation, again due to the excessive travel allegation. Hamlet urged Staun to accept the deal.

Harkavy then left a message for Klausman, and all four men waited for him to return the call. When the call came in, all four men went to Hamlet's conference room, and the call was placed on a speaker phone. Harkavy reiterated the deal that had been offered that morning first to Derr, then to Staun. It was again confirmed that Derr, but not Staun, would receive accrued vacation pay. After all points of both agreements had been confirmed by Klausman, Harkavy accepted on behalf of Derr, and Hamlet accepted on behalf of Staun.

Harkavy and Klausman then discussed the date on which the agreement would take effect. Klausman indicated that he did not want Derr and Staun to return to work the following Monday. Harkavy asked, since the employees were in the middle of a pay period, if Derr and Staun could receive their regular pay through February 5, 1993, at which time the severance agreement would take effect. Klausman agreed. Derr and Staun did not return to work, and both received their regular pay through February 5, 1993.

Harkavy volunteered to prepare proposed drafts of the severance agreements and forward them to Klausman. Harkavy then prepared drafts of two documents, a resignation letter to the new president of Beaman and a letter of agreement from Rally's. The Rally's letter contained the following provision:

> Rally's obligation to you is not dependent upon the approval of any judicial, administrative or private authority and is subject only to Beaman's failure for any reason to perform its obligations to you when due under your agreements with Beaman.

(J.A. 969).

Harkavy then faxed these documents to Hamlet for his review. Hamlet made some changes and then faxed his revisions to Harkavy.

On February 3, 1993, Harkavy faxed the documents to Klausman with a cover sheet which read: "To expedite the effectuation of our agreements, here are drafts which Fred and I have prepared, but which our clients have not yet reviewed." (J.A. 967). The documents included Derr's name, but not Staun's. Harkavy testified that, since the agreements were to contain essentially the same language, there was no need to fax an identical set of proposed drafts with Staun's name on them. Klausman transmitted the documents to Beaman's counsel, Charles Ivey (Ivey), for review. Ivey was out of town and his partner, James Talcott (Talcott), reviewed the documents. In a letter to Klausman, Talcott informed Klausman that, with a few minor clarifications, the agreements seemed fair to Rally's, Beaman, Derr, and Staun.

Derr received his severance checks and executed a letter regarding the agreement, which contained the identical language noted above. Staun received his last paycheck on February 8, 1993, but did not receive any severance checks. In the first week of March 1993, Staun received a termination for cause letter from Ivey.

On April 28, 1993, Staun filed a complaint in the Superior Court for Guilford County, North Carolina alleging four causes of action against Rally's: (1) breach of contract under North Carolina law; (2) violation of the North Carolina Wage and Hour Act; (3) negligent misrepresentation under North Carolina law; and (4) unfair acts or practices under North Carolina law.

On May 28, 1993, Rally's removed the case to the United States District Court for the Middle District of North Carolina. On January 7, 1994, the case was referred to arbitration. Attempts at arbitration were unsuccessful and the case was set for trial.

On January 9, 1995, the district court empaneled a jury and heard arguments upon various pretrial issues. The district court ruled that it would not permit Staun's claim for a violation of the North Carolina Wage and Hour Act to be presented to the jury, instead limiting the issues to be tried to "whether or not there was a contract and whether or not that contract was breached." (J.A. 101).*

---

*On January 10, 1993, Staun voluntarily dismissed with prejudice his negligent misrepresentation claim and his unfair acts or practices claim. On January 18, 1993, the district court dismissed Staun's North Carolina Wage and Hour Act claim as a matter of law.

At the close of Staun's evidence, Rally's moved for judgment as a matter of law on the ground that the North Carolina Statute of Frauds (Statute of Frauds) barred the enforcement of the alleged agreement and the ground that no agreement had been formed on January 29, 1993. The district court denied the motion.

The jury was presented with five interrogatories. The first four interrogatories asked: (1) whether Klausman made an offer to Staun on behalf of either Beaman and/or Rally's on January 29, 1993; (2) whether the offer was accepted orally by Hamlet and/or implicitly by Staun's conduct in not returning to work; (3) whether Klausman had apparent authority to bind Beaman and/or Rally's; and (4) whether the agreement was ratified by Rally's and/or Beaman. The fifth and final interrogatory asked the jury to decide if the agreement was an independent obligation by Rally's or was a guarantee, dependent on any obligation by Beaman to Staun, or neither of those choices.

After deliberations, the jury answered the first four interrogatories in favor of Staun, but could not reach unanimous agreement on the fifth interrogatory. After hearing the arguments of counsel, the district court substituted the following question for the fifth interrogatory:

> Members of the jury, in lieu of question 5, I'm going to submit to you a substitute issue at this time which reads: Has it been proven by a preponderance of the evidence that Rally's would pay Mr. Staun if for any reason whatever Beaman did not pay? And any reason whatever means any reason, whether or not Mr. Staun was terminated for cause or any reason, whether bankruptcy court wouldn't allow it, whether Beaman just decided not to pay it. Any reason whatever encompasses any reason whatever, just exactly what those words mean. So the question to you is, has that been proven by a preponderance of the evidence.

(J.A. 949).

In response, the jury answered this question affirmatively. A successive interrogatory on whether the agreement had been breached was also answered affirmatively. A final judgment, awarding Staun

his severance, health benefits, and costs was entered on May 31, 1995.

On June 9, 1995, Rally's filed a motion for judgment as a matter of law or, in the alternative, for a new trial. On April 17, 2000, the district court denied Rally's motion.

## II

On appeal, Rally contends that the district court erred in denying its motion for judgment as a matter of law or, in the alternative, for a new trial because: (1) no evidence supports the jury's finding that an enforceable agreement was formed on January 29, 1993; (2) the alleged enforceable agreement is barred by the Statute of Frauds; (3) the district court improperly bifurcated the issues to be tried by the jury and failed to permit testimony on the issue of termination for cause; and (4) the jury should have been instructed and heard evidence regarding the Statute of Frauds.

After considering the joint appendix, the parties' briefs, and the oral arguments of counsel, we are persuaded that the district court correctly decided the issues before it. We therefore affirm on the reasoning of the district court. *Staun v. Rally's, Inc.*, No. 2:93CV00333 (M.D.N.C. April 17, 2000).

*AFFIRMED*